## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **ALPINE SECURITIES CORPORATION; and SCOTTSDALE CAPITAL ADVISORS CORPORATION** : | |
| : | |
| **Plaintiffs,** : | **Civil Action No.  19-1425** |
| : | |
| **vs.** : | |
| : | |
| **RANDALL JONES; VISION FINANCIAL MARKETS, LLC; and HOWARD ROTHMAN** : | **JURY TRIAL DEMANDED** |
| : | |
| **Defendants.** : | |

Plaintiffs Alpine Securities Corporation and Scottsdale Capital Advisors Corporation, by and through their undersigned counsel, hereby complain against Defendants Randall Jones, Vision Financial Markets, LLC, and Howard Rothman, and alleges as follows:

### PARTIES

1.      Plaintiff Alpine Securities Corporation ("Alpine") is a corporation organized and existing under the laws of the State of Utah, with its principal place of business in Salt Lake County, Utah.

2.      Plaintiff Scottsdale Capital Advisors Corporation ("Scottsdale") is a corporation organized and existing under the laws of the State of Arizona, with its principal place of business in Maricopa County, Arizona.

3.      Alpine and Scottsdale are referred to collectively herein as "Plaintiffs."

4.      Defendant Randall "Randy" Jones ("Jones") is an individual who upon information and belief resides in Oxford County, Maine.  From approximately June 2011

through January 2019, Jones served as Alpine's Managing Director of Business Development. From January 2019 through May 2019, Jones served as the Managing Director of Business Development at Scottsdale.

5.     Defendant Vision Financial Markets, LLC ("Vision") is a limited liability company that upon information and belief exists and was organized under the laws of the State of Delaware and has its principal place of business in Stamford, Connecticut.

6.     Defendant Howard Rothman ("Rothman") is an individual who upon information and belief resides in Stamford, Connecticut.  Plaintiffs are informed and believe that Rothman is the Chief Executive Officer, Managing Member, and Chief Investment Officer at Vision.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to the claims herein occurred in this District, and Defendants Rothman and Vision reside in this District.

## GENERAL ALLEGATIONS

### Alpine, Scottsdale, and the Microcap Industry

9.     Plaintiffs Alpine and Scottsdale are two of the largest firms in the microcap securities market.

10.     Alpine is a registered broker-dealer that is an industry leader for clearing over the counter stock, and Scottsdale is a brokerage firm that trades microcap securities. Scottsdale introduces customers on a fully disclosed basis to Alpine and clears and settles customer trades through Alpine as the clearing firm.

11.     Alpine and Scottsdale have numerous common customers and are related by common indirect beneficiary ownership.   As the clearing firm, Alpine would have complete access to Scottdale's client information, financial information, and procedures.  Alpine and Scottdale have the same indirect beneficial owners, a mutual sharing agreement, and service the same customers.

**Jones Enters into the Alpine NDA**

12.     In 2011, Alpine hired Jones to manage trading and sales of its direct customer business well as perform various other compliance duties.  From approximately June 2011 through January 2019, Jones served as Alpine's Managing Director of Business Development. Jones's responsibilities at Alpine included, *inter alia,* overseeing regulatory deposit due diligence, anti-money laundering, customer trading, and customer services.

13.     Alpine's employees are exposed to, and entrusted with, information that is commercially valuable to Alpine and not generally known or readily ascertainable in the broker-dealer securities industry or the public at large, including, *inter alia*, Alpine's client list ("Alpine's Client List").  This client list includes the customers of its correspondents such as Scottsdale.  While working at Alpine, Jones was exposed to and entrusted with the foregoing information.

14.     Alpine's Client List, including the substantial confidential information contained therein, enables Alpine to successfully compete in its industry, and Alpine's Client List further provides to Alpine advantages in the marketplace regarding the services and related broker-dealer activities it provides.

15.     Alpine's Client List contains thousands of customers and has been compiled over the course of more than 30 years at great expense to the company.  Among other things, Alpine's

Client List contains information regarding the clients' trade histories, taxes, trust holdings, salaries, pensions, beneficial owners, and control people.  Such information is not generally known to the public or in the industry, and would only be discoverable by extraordinary efforts, if at all.

16.     In addition, Alpine's confidential client list information, includes, without limitation, client names, available funds, stock activities, current investment holdings/balances, trade confirmations, incurred commissions and fees, trade confirmations, investment objectives and experiences, account values, wiring information, money positions, and predefined compliance reports.

17.      Alpine has taken numerous steps to maintain the secrecy of its client list, including, *inter alia*, requiring all employees to sign confidentiality agreements and making all of its computers password-protected.

18.     In April 2015, Alpine created a formal, written Employee Agreement on Confidentiality and Use of Company Property ("NDA") that all employees were required to review and sign as a condition of employment or continued employment.   Alpine created the NDA in order to ensure that its employees understood that Alpine's confidential information was to be kept secret and was only to be used for Alpine's business.

19.     In April 2015, Jones executed the NDA, a true and correct copy of which is attached hereto as Exhibit A.

20.     As acknowledged in the NDA, Jones was exposed to information "that is commercially valuable to [Alpine] with respect to its business [and] is not generally known or readily ascertainable in the business of the [Alpine]."

21.     The NDA provides in relevant part:

4

When Employee's [Jones] employment with Company [Alpine] ends, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and other materials which consist of and contain Confidential Information in whatever format such originals and copies are stored, maintained or used. Employee will also return to Company all personal property belonging to Company. ...

Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains Confidential Information legally protectable hereunder.

22.     From April 2015, and continuing through January 2019, Jones received, helped create, maintain, and/or had access to Alpine's Client List.

**Jones Agrees Not to Disclose Scottsdale's Client Information**

23.     In January 2019, Jones left Alpine and started working at Scottsdale as its "Managing Director of Business Development" where his responsibilities included, *inter alia,* overseeing regulatory deposit due diligence, anti-money laundering, trading and sales compliance, and business development.  Among other things, Jones pursued new customers, serviced existing customers, and reviewed certificates of deposits received by Scottsdale from its customers. Consequently, Jones was exposed to and entrusted with client information that is commercially valuable to Scottsdale and not generally known or readily ascertainable in the broker-dealer securities industry or the public at large, including, *inter alia*, client names, available funds, stock activities, current investment holdings/balances, trade confirmations, incurred commissions and fees, trade confirmations, investment objectives and experiences, account values, wiring information, money positions, and predefined compliance reports (collectively, "Scottsdale's Client Information").

24.     Scottsdale's Client Information enables it to successfully compete in its industry and gives Scottsdale advantages in the marketplace regarding the services it provides.

25.     Scottsdale's Client Information includes information regarding hundreds of customers and has been compiled over the course of more than 18 years at great expense to the company.  Among other things, Scottsdale's Client Information includes information regarding Scottsdale's clients' trade histories, taxes, trust holdings, salaries, pensions, beneficial owners, and control people.  Such information is not generally known to the public or in the industry, and would only be discoverable by extraordinary efforts, if at all.

26.     Upon arrival at Scottsdale, Jones received a copy of Scottsdale's written supervisory procedures ("Scottsdale's WSP").

27.     Scottsdale's WSP provides in relevant part:

> It is the obligation of Firm and each of its Associated Persons to respect and protect the right to privacy of all the customers.
> Confidential or proprietary information, obtained in the course of an individual's association or employment with the Firm, is not to be used for personal gain or to be shared with others for personal benefit. . . .
> All customer information including financial condition, plans, proposals, and prospectuses are considered confidential information and will not be disclosed to anyone outside of the Firm's designated personnel. . . .
> Upon termination, the Associated Person shall return . . . all Firm property including, without limitation, office keys, computer files, customer files, and any other materials deemed confidential or proprietary by Firm.

28.     Scottsdale's WSP further provides that all files are locked in a secure area, access to computers is limited to authorized persons with passwords to control access to files, and websites that employees use to access customer information are password protected.

29.     Jones resigned from Scottsdale on May 17, 2019.

6

**Jones Conspires with Vision and Rothman to Misappropriate Alpine's Client List and Scottsdale's Client Information and Poach Plaintiffs' Clients**

30.     Beginning in early 2019, Alpine pursued an omnibus clearing arrangement with Vision, which would allow Alpine to clear securities under its own name for the benefit of its clients, without identifying the underlying owners, thereby avoiding certain charges levied by the Depository Trust & Clearing Corporation and increasing its profits.

31.     Because Jones ran the trading desk at Alpine, he spearheaded these discussions on behalf of Alpine with Rothman at Vision.

32.     Although the Alpine-Vision omnibus clearing negotiations appeared promising and were expected to result in an agreement, by April, 2019, Vision had cooled on the arrangement for reasons then-unknown to Alpine.

33.     When Vision withdrew from the negotiations associated with the proposed omnibus agreement, Vision represented that it was then no longer interested in the microcap or over-the-counter bulletin board markets.

34.     However, this representation later proved to be false, when Vision, with the assistance of Jones and Rothman, solicited Alpine's clients with the use of misappropriated client list information.

35.     In mid-April 2019, Alpine's CEO and CCO, Chris Doubek, contacted Rothman in an effort to conclude the omnibus agreement.  Rothman, however, was purposefully non-committal and evaded Doubek's entreaties.  Alpine would soon learn the reason for Rothman's hesitation: Jones, Vision, and Rothman had conspired to steal Plaintiffs' clients to Vision, through the theft or misappropriation of Alpine's Client List information and Scottsdale's Client Information.

36.     On information and belief, after leaving Alpine, Jones wrongfully retained Alpine's Client List and Scottsdale's Client Information.   Plaintiffs have learned that Alpine's Client List and Scottsdale's Client Information have been compromised in favor of Vision, and that certain clients have been solicited on the basis of client list information, which would not have been known to Vision and Rothman, but for Jones's breach of the NDA and Scottsdale's WSP.

37.     Jones, in addition, failed to return client list information when he terminated his employment with Alpine and Scottsdale.

38.     The misappropriation of Alpine's Client List and Scottsdale's Client Information by Jones, with the assistance of Rothman to benefit Vision, provides Vision with an established list of clients; moreover and crucially, it allows Vision, through the efforts of Jones and Rothman, to undercut Plaintiffs' commission structures, and thereby enables Vision to weaponize the client information against Plaintiffs in favor of Jones, Rothman and Vision.

39.     Prior to Jones's departure from Scottsdale, Vision had not previously solicited Plaintiffs' customers.

40.     Vision started recruiting Plaintiffs' clients immediately after Jones left his employment.  This would not have occurred but for a conspiracy and agreement to misappropriate Plaintiffs' confidential client list information for the benefit of Vision, through the efforts and assistance of Rothman.

41.     In May 2019, Plaintiffs learned that several of their clients had been contacted by Jones, who contacted them to bring their accounts to Vision.

42.     On or about May 28, 2019, an Alpine business consultant spoke to Jones, who stated that he was, in fact, working at Vision.  Jones freely acknowledged that he was trying to

8

solicit Plaintiffs' clients to Vision, and claimed he had a right to do so because he did not have a non-compete agreement with Plaintiffs.

43.     Vision and Rothman knew or should have known that Jones had a NDA that prevented his retention, use, and disclosure of Alpine's Client List information.  Similarly, Vision and Rothman knew or should have known that Jones was bound by Scottsdale's WSP, as such written supervisory procedures are mandated by FINRA.  Notwithstanding their knowledge of the foregoing, Vision and Rothman encouraged Jones to exploit Alpine's Client List and Scottsdale's Client Information to contact Plaintiffs' clients and encourage them to bring their business to Vision.

44.     Vision and Rothman purposely directed their illegal activities to Plaintiffs' clients, by encouraging and supporting Jones to breach his NDA with Alpine and Scottsdale's WSP for the benefit of Vision.

45.     These were intentional actions by Vision and Rothman, in agreement with and participation by Jones, to illegally use Plaintiffs' client list information for the benefit of Vision.

46.     Vision, Rothman and Jones each understood that their actions, through and by Jones, would cause Alpine and Scottsdale to suffer damages.

47.     The damaging conduct of Jones, Rothman and Vision continues today, in part based on Jones's admission that he continues to target Plaintiffs' customers with the use of Alpine's Client List and Scottsdale's Client Information.

48.     Vision, through the directed conduct of Jones, with the assistance, knowledge and support of Rothman, sought to poach Plaintiffs' clients by means of the illegal use of Alpine's Client List and Scottsdale's Client Information.

49.     By agreement, the object to be accomplished by Vision, Rothman and Jones was to poach Plaintiffs' clients by illegally misappropriating Alpine's Client List and Scottsdale's Client Information.

50.     This illegal scheme, to which Rothman, Vision and Jones each agreed, was accomplished through the breach of the NDA and Scottsdale's WSP, and the misappropriation of Plaintiffs' confidential and proprietary client information.

51.     With the advantage of Alpine's Client List and Scottsdale's Client Information, Jones, Vision and Rothman directly targeted potential clients that they knew actively used broker-dealer services. They did not have to spend the time and resources that would have been required to independently identify and contact these clients – time and resources that Plaintiffs had spent developing its database and client list information.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**
**(Alpine against Jones/Injunctive Relief)**

52.     By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

53.     The NDA is a valid and binding contract between Alpine and Jones.

54.     Alpine has performed, and continues to perform, all of its obligations under the NDA.

55.     Jones has breached, and continues to breach, the NDA by maintaining documents containing Alpine's confidential information and using Alpine's confidential information to solicit Alpine's clients.

56.     Jones's breach of the NDA is material and without justification.

57.     As a direct and proximate result of Jones's breach, Alpine has suffered, and will continue to suffer general and consequential damages in an amount to be proven at trial.

58.     As a direct and proximate result of Jones's breach, Alpine has also suffered, and will continue to suffer irreparable harm, the amount of which may be difficult to ascertain

59.     Pursuant to section 7(c) of the NDA, without limitation, Jones has agreed that Alpine "shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as [Alpine] deems appropriate."

### SECOND CAUSE OF ACTION
**(Breach of Fiduciary Duty)**
**(Alpine against Jones)**

60.      By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

61.     By virtue of his role as Alpine's Managing Director of Business Development, and Alpine's representative in negotiating the omnibus clearing agreement with Vision, Jones had a fiduciary duty to Alpine including a duty of loyalty to Alpine, a duty to act in the best interests of Alpine and an obligation to act in good faith in all matters related to his work with Alpine.

62.     As set forth above, Jones breached his fiduciary duty and advanced his own interests to the detriment of Alpine by misappropriating Alpine's Client List and conspiring with Vision and Rothman to use the misappropriated Client List to poach Alpine's clients.

63.     Jones further breached his fiduciary duty by failing to advance Alpine's interests in the negotiations with Vision regarding the omnibus clearing agreement, and instead advancing his own interests and those of the other Defendants to the determent of Alpine by conspiring with

Vision, and Rothman to steal Alpine's clients and bring them to Vision, through the misappropriation of Alpine's Client List information.

64.     Alpine has sustained and will continue to sustain actual damages as a direct and proximate result of Jones' breach of his fiduciary duty, as well was additional damages to be determined at trial.

65.     The misconduct of Jones as described above was not in good faith, reasonable or prudent, and was in reckless disregard of the rights of Alpine or was an intentional and wanton violation of Alpine's rights.

## THIRD CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duties)
### (Alpine against Vision and Rothman)

66.     By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

67.     When Jones engaged in the misconduct described above, defendants Vision and Rothman, knew or were generally aware that Jones was breaching his fiduciary duties to Alpine, and Vision and Rothman knew or were generally aware of their roles as part of the overall illegal or tortious activities that occurred with respect to Alpine.

68.     Through their misconduct described herein, defendants Vision and Rothman provided knowing and substantial assistance to Jones in his breaches of his fiduciary duties to Alpine.

69.     By aiding and abetting Jones's breaches of his fiduciary duties to Alpine, Vision and Rothman are jointly and severally liable for the damages Alpine has suffered and will continue to suffer as a direct and proximate result of Jones's breaches of his fiduciary duties.

## FOURTH CAUSE OF ACTION
### (Conspiracy to Breach Fiduciary Duties)
### (Alpine against All Defendants)

70.     By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

71.     The Defendants knowingly participated in a common unlawful scheme to further and assist Jones's breaches of his fiduciary duties owed to Alpine.  It was a further purpose of the scheme to misappropriate Alpine's confidential Client list and use the information contained therein to tortuously interfere with Alpine's business relationships with its clients, and to divert Alpine's clients to Vision.

72.     The numerous acts described in the foregoing paragraphs were undertaken by the Defendants in furtherance of the scheme.

73.     As a direct and proximate result of the Defendants' tortious conduct, Alpine has sustained actual damages, as well as additional damages to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)
### (Scottsdale against Jones)

74.     By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

75.     By virtue of his role as Scottsdale's Managing Director of Business Development, Jones had a fiduciary duty to Scottsdale including a duty of loyalty to Scottsdale, a duty to act in the best interests of Scottsdale, and an obligation to act in good faith in all matters related to his work with Scottsdale.

76.     As set forth above, Jones breached his fiduciary duty to Scottsdale and advanced his own interests to the detriment of Scottsdale by misappropriating Scottsdale's Client

Information and conspiring with Vision and Rothman to use the misappropriated Client Information to poach Scottsdale's clients.

77.     Scottsdale has sustained actual damages as a direct and proximate result of Jones' breach of his fiduciary duty, as well was additional damages to be determined at trial.

78.     The misconduct of Jones as described above was not in good faith, reasonable or prudent, and was in reckless disregard of the rights of Alpine or was an intentional and wanton violation of Alpine's rights.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duties)
### (Scottsdale against Vision and Rothman)

79.     By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

80.     When Jones engaged in the misconduct described above, defendants Vision and Rothman, knew or were generally aware that Jones was breaching his fiduciary duties to Scottsdale, and Vision and Rothman knew or were generally aware of their roles as part of the overall illegal or tortious activities that occurred with respect to Scottsdale.

81.     Through their misconduct described herein, defendants Vision and Rothman provided knowing and substantial assistance to Jones in his breaches of his fiduciary duties to Scottsdale.

82.     By aiding and abetting Jones's breaches of his fiduciary duties to Scottsdale, Vision and Rothman are jointly and severally liable for the damages Scottsdale has suffered and will continue to suffer as a direct and proximate result of Jones's breaches of his fiduciary duties.

## SEVENTH CAUSE OF ACTION
### (Conspiracy to Breach Fiduciary Duties)
### (Scottsdale against All Defendants)

83.    By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

84.    The Defendants knowingly participated in a common unlawful scheme to further and assist Jones's breaches of his fiduciary duties owed to Scottsdale  It was a further purpose of the scheme to misappropriate Scottsdale's confidential Client Information and use that information to tortuously interfere with Scottsdale's business relationships with its clients, and to divert Scottsdale's clients to Vision.

85.    The numerous acts described in the foregoing paragraphs were undertaken by the Defendants in furtherance of the scheme.

86.    As a direct and proximate result of the Defendants' tortious conduct, Scottsdale has sustained actual damages, as well as additional damages to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Tortious Interference with Business Relations and Economic Expectancy)
### (All Plaintiffs against All Defendants)

87.    By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

88.    The Defendants were aware that the Plaintiffs have or had a business relationship with the clients referenced in the Alpine Client List and the Scottsdale Client information.

89.    The Defendants intentionally and maliciously interfered with the Plaintiffs' business relationship with their clients by misappropriating the Plaintiffs' confidential client lists and client information and utilizing that unlawfully misappropriated information to poach the Plaintiffs' clients and divert business away from the Plaintiffs to their own benefit.

90.     As a direct and proximate result of the Defendants' tortious conduct, the Plaintiffs have sustained actual damages, as well as additional damages to be determined at trial.

91.      Unless the defendants are enjoined from continuing to engage in this conduct, the Plaintiffs will continue to suffer actual damages.

### NINTH CAUSE OF ACTION
**(Violation of Connecticut Unfair Trade Practice Act, General Statutes § 42-110 et seq)**
**(All Plaintiffs Against All Defendants)**

92.     By this reference, Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though set forth fully herein.

93.     Vision, Rothman, and Jones have at all relevant times herein engaged in a trade or commerce in the State of Connecticut as those terms are defined in Connecticut General Statutes Sec. 42-110a(4) and are persons as that terms is defined by Connecticut General Statutes Sec. 42-110a(3).

94.     One or more of the following acts by the Defendants constitutes an unfair act or practice within the meaning of Conn. Gen. Stat. § 42-110b(a): (a) conspiring to misappropriate the Plaintiffs' confidential Client List and Client information; (b) misappropriating the Plaintiffs' confidential Client List and Client information; (c) intentionally and maliciously using the Plaintiffs' unlawfully misappropriated Client List and Client information to poach the Plaintiffs' clients and tortuously interfere with the Plaintiffs' business relationships and economic expectancy.

95.     The foregoing conduct violates public policy, is immoral, unethical or unscrupulous and is substantially injurious to consumers, competitors or businesspeople, including the Plaintiffs.

96.     As a direct and proximate result of the aforesaid conduct, Alpine and Scottsdale have suffered substantial injury and ascertainable loss.

**TENTH CAUSE OF ACTION**
**(Statutory Theft, Conn. Gen. Stat. § 52-564)**
**(All Plaintiffs against All Defendants)**

97.     By this reference, Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

98.     The Defendant Jones stole Alpine's confidential Client List and Scottsdale's confidential Client Information in order to use such property for his own benefit and to the detriment of the Plaintiffs.

99.     The Defendants Rothman and Vision knowingly received and concealed Alpine's confidential Client List and Scottsdale's confidential Client Information, knowing that such property had been stolen by Jones.

100.     The Defendants committed the foregoing actions with the intent to deprive the Plaintiffs of their property.

101.     As a direct and proximate result of the Defendants' conduct, the Plaintiffs have sustained actual damages, as well as additional damages to be determined at trial.

## FOR RELIEF

WHEREFORE, PLAINTIFFS request relief as follows:

1.      An order of this Court preliminarily and permanently enjoining Jones, Vision, and

Rothman, and all persons acting in concert or coordination with them from retaining or using

Plaintiffs' confidential information;

2.      Plaintiffs' general and consequential damages, in an amount to be proven at trial;

3.      Punitive damages;

4.      Attorneys' fees;

5.      For all costs of suit incurred; and

6.      For such other relief as the court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all claims and issues so triable

DATED this 11th day of September, 2019.

                                        SPEARS MANNING & MARTINI, LLC

                                        /s/ Brian E. Spears
                                        Brian E. Spears. Esq. ct14240
                                        2425 Post Road, Suite 203
                                        Southport, CT 06890
                                        203-292-9766
                                        bspears@spearsmanning.com

                                        *Attorney for the Plaintiffs*

18